# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| NICOLE RANDECKER, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN COLVIN, Acting ) <br> Commissioner of Social Security, ) <br> Defendant. ) | No. 12 CV 50280 <br> Magistrate Judge Iain D. Johnston |

## MEMORANDUM OPINION AND ORDER

Nicole Randecker brings this action under 42 U.S.C. § 405(g), seeking remand of the decision denying her social security disability benefits. For the reasons set forth below, the case is remanded.

## I. BACKGROUND

Ms. Randecker was 45 years old on the date of the ALJ's decision. R. 54. She last worked in 2005, when she was fired from her job as a registered nurse. R. 65. Her psychiatric illnesses emerged several years earlier when she was first hospitalized for a psychotic episode. The following summary is largely a recounting of the many hospitalizations that followed.

In September 2003, Ms. Randecker was taken to the hospital because she was acting bizarre and aggressive. R. 620-25. She was irritable and could not sleep; she explained that she had a vision when she saw a patient at the nursing home who reminded her of the man who had previously sexually abused her; she had visions of "Indian females being worried about their children being molested"; she said that her mother and grandmother both had mental illnesses; she denied using drugs. R. 620. Because she was so agitated, doctors gave her a shot of Geodon to calm her down. Dr. Terrence Norton preliminarily diagnosed her with acute psychosis. R. 624.

He ordered tests to determine if she was using drugs, but stated that he believed that "based on her family history more than likely this is a primary mental illness." *Id.* He diagnosed her with "Bipolar disorder type I, most recent episode manic." R. 620.

The next acute episode occurred a year later. In November 2004, she was arrested for bizarre, aggressive, and threatening behavior. R. 658. While in jail, "she was shouting obscenities, she was washing her hair in the toilet, was urinating and defecating on herself, refusing to eat meals, destroying her mattress, and believed the police were gassing people." *Id.* On November 11, 2004, she was involuntarily admitted to the hospital where she stayed until November 23, 2004. *Id.* She was given Geodon, Lorazepam, Depakote, and Divalproex. R. 669. Psychiatrist Grace Thundiyil diagnosed her on discharge as "Bipolar I Disorder, Manic with Mood Congruent Psychotic Features, Improved, Polysubstance Abuse." *Id.*

For the remainder of 2004 and throughout 2005, Ms. Randecker was treated on an outpatient basis and was seen by several psychiatrists.

In January 2006, she was arrested and put in restraints because she was agitated and delusional, screaming continuously "Are you Hussain?" R. 644. While in jail, she bruised herself, shouted obscenities, and smeared feces on the walls; she stated that she had a relationship with the FBI and that they would protect her. R. 641, 644. She tested positive for marijuana. R. 641. She eventually calmed down when some of her medications were increased. R. 642. Psychiatrist Howard S. Paul diagnosed her on discharge as "Bipolar I Disorder, Manic, With Psychotic Features, Marijuana Abuse." R. 642.

Two months later, in March 2006, she was hospitalized again because she was psychotic, manic, and aggressive. R. 626. She was hearing voices, and could not sleep because a black horse would come for her if she did. R. 629. She had not taken her medication.

In February 2007, she was arrested for disorderly conduct after threatening to kill a friend. R. 731. She was involuntarily admitted to Singer Medical Health Center. Psychiatrist Farah Pathan diagnosed her on discharge as "Bipolar Disorder, Manic Episode With Psychotic Features, Marijuana Abuse." R. 426.

In July 2009, she was hospitalized because she was making combative, profane, and bizarre statements. R. 524. She was given Geodon and Ativan and put in restraints. *Id.* After being discharged and then relapsing a few days later and being readmitted, she was discharged a second time on August 4, 2009. R. 546. Psychiatrist Prabhakar Pisipati diagnosed her on discharge with "Bipolar disorder, manic type, schizoaffective disorder. Marijuana dependence."

On December 16, 2009, she was admitted involuntarily to Mercy Medical Center. R. 508. Because she was very angry, she was given Haldol and placed in restraints. R. 561. Her son suspected that she had been abusing substances. R. 559. She was discharged on December 21, 2009 but then re-admitted on December 27, 2009 and finally discharged on January 11, 2010. R. 583. Throughout this stay, she was delusional, was vocalizing bizarre ideations (*e.g.* the tinsel on the Christmas tree is harming people), and was biting and scratching staff. R. 516, 573.

In 2010, Ms. Randecker became pregnant and had a baby. Also, in 2010, she began seeing a psychiatrist named Peter Szeibel. She saw him three times. On December 30, 2010, Dr. Szeibel filled out a mental health questionnaire in which he diagnosed her as "Bipolar, hypomanic" and stated that her prognosis was poor without treatment and fair with treatment. R. 772-776. Also in 2010, Ms. Randecker saw a therapist named Ashley Sieverding. On December 15 2010, Sieverding filled out the same questionnaire, reaching the same basic conclusion as Dr. Szeibel.

In February 2010, Ms. Randecker filed applications for disability insurance benefits and for supplemental security income. R. 31. She alleged a disability beginning October 31, 2005. *Id.* On October 21, 2011, the ALJ ruled that Ms. Randecker was under a disability, but that a substance use disorder is a contributing factor material to this determination and that she is therefore not disabled under the Social Security Act. R. 32. He concluded that "when the claimant is medication compliant and relatively drug free, she would be capable of simple and routine tasks with no contact with the public." R. 36.

Shortly after the ALJ issued his opinion, Ms. Randecker was again hospitalized. She went to the emergency room on November 8, 2011 with mania and delusional ideation, telling doctors that the government was planting wolves in her area to get terrorists. R. 790. According to medical records, she was taking her medications and not using drugs. R. 790-91. She was discharged on November 10, 2011 with a diagnosis of "mania" and "psychosis." Although these records were submitted to the Appeals Council, the Council summarily denied her request for review of the ALJ's decision.

## II. DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh

Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

This case involves the additional question of Ms. Randecker's substance abuse. The Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). "When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).

Here, Ms. Randecker argues that the ALJ improperly discounted the opinion of her treating psychiatrist and improperly "played doctor" when he analyzed the lengthy medical record. This Court agrees with both arguments.

The treating physician rule is based on 20 C.F.R. §404.1527(c)(2). Under this section, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings

and consistent with other substantial evidence in the record. *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).

If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, the ALJ must apply the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).[1] Failure to apply checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist); *Moss*, 555 F.3d at 561 ("the choice to accept one physician's opinions but not the other's was made by the ALJ without any consideration of the factors outlined in the regulations"). Similarly, ALJs commit reversible error by simply stating that they considered the checklist without showing in their decisions that they did, in fact, consider them. *See Campbell*, 627 F.3d at 308 ("Here, the ALJ's decision indicates that she considered opinion evidence in accordance with [the checklist]. However, the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."). In other words, ALJs must show their work.

---

[1] The factors are: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

Here, the ALJ failed did not follow this rule. First, the ALJ did not explicitly analyze why Dr. Szeibel's opinion was not given controlling weight.[2] It is undisputed that he was a treating psychiatrist. Specifically, the ALJ did not explicitly analyze (i) whether Dr. Szeibel's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or (ii) whether it consistent with the "other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). This by itself is reversible error. *Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000) (reversing and remanding because the ALJ failed to determine whether the treating physician's findings were entitled to controlling weight). Second, the ALJ did not explicitly apply the checklist factors. No finding was made, for example, about the length of the treating relationship nor was any discussion given about the degree of specialization.

Although the ALJ did not explicitly go through the checklist, he did acknowledge the treating physician rule and he did give at least a brief explanation for why he gave little to no weight to Dr. Szeibel's opinion, thus raising a question as to whether he implicitly applied the checklist. He articulated two basic reasons.[3] First, he noted that Dr. Szeibel "seems to" base his conclusions on "subjective statements made by the claimant, rather than the objective evidence as a whole." R. 40. Second, he believed that Dr. Szeibel's conclusions were contradicted by his notes indicating that Ms. Randecker was doing well in 2010 and in the first part of 2011. *Id.*

These reasons are not sufficient. The first reason is hard to assess as it is merely a conclusion without any explanation. It is thus not clear what the ALJ's precise concern was as he does not discuss or even identify what the particular subjective statements were. As a psychiatrist, Dr. Szeibel presumably could rely in part on statements made by the patient. In fact,

---

[2] Ms. Randecker makes the same argument regarding therapist Sieverding. For simplicity, this Court will confine its analysis to Dr. Szeibel because the therapist's conclusions are essentially the same.

[3] He gave two separate explanations (R.36 and R.40), but they are the same.

in the ALJ's own lengthy summary of the evidence (discussed below), he relied on subjective statements made by Ms. Randecker, as did many of the other psychiatrists who treated her. Perhaps, the ALJ was complaining that Dr. Szeibel did not discuss diagnostic tests. If so, the ALJ should identify what tests would be appropriate for bipolar disorder.

The second reason is likewise unavailing. The ALJ believed that Dr. Szeibel's notes and specific observations about Ms. Randecker's condition in 2010 were inconsistent with his larger conclusion that she was disabled even when not using drugs. This is not necessarily an inconsistency. In the questionnaire, Dr. Szeibel acknowledged this very issue:

> Patient has a cyclic (waxing and waning) disturbance characterized by remissions and exacerbations. Although she is fairly stable currently, there is a history of unexpected, rapid [] flare-ups, during which she has hallucinations and irrational thinking, as well as depressions.

R. 774. The medical history provides support for this conclusion. Although Ms. Randecker was hospitalized often since 2003, she also had periods where her symptoms were less pronounced. In *Kangail*, the Seventh Circuit pointed out that bipolar disorder is typically episodic, such that it would be reasonable to expect normal periods:

> [The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.

454 F.3d at 629. This same analysis is relevant here. The ALJ noted, for example, that Ms. Randecker "did not have any significant complaints" during her office visits with therapist Sieverding in 2010. R. 40. However, just as in *Kangail*, these activities are not enough to reject the treating physician's opinion. The ALJ failed to consider that the period in 2010 could have been merely a good period in the normal cyclical progression of the illness. For the above reasons, this Court finds that a remand is warranted under the treating physician rule.

A remand is also appropriate because the ALJ failed to consider contrary lines of evidence when he independently reviewed the medical evidence. His overarching conclusion was that *all* of Ms. Randecker's hospitalizations were caused either by her drug use or her failure to take medication. R. 39. The ALJ reached this conclusion by trying to correlate drug-free and medication-free periods with symptomatic and non-symptomatic periods.

As an initial point, this approach is hard to assess because it lumps two significant issues—drug use and medication—into one overlapping narrative. Because the two issues have different legal implications, this Court will address them separately. Focusing first on the drug issue, the Court finds that the record is not fully developed regarding exactly when Ms. Randecker was taking drugs or which drugs she was taking. At the hearing, the ALJ did not inquire into this issue at all. In his opinion, the ALJ noted that Ms. Randecker "smoked marijuana on a regular basis and that she also used methamphetamines." R. 35; *see also id.* (referring to her "ongoing" polysubstance abuse). The impression is that she was a consistent hard-core user of marijuana, meth, and alcohol. Yet, at other points, the ALJ suggested her drug use was sporadic and mostly involved marijuana. If the latter is true, then a question arises whether the episodic nature of the bipolar disorder was causing the drug use and not the other way around. The Seventh Circuit in *Kangail* discussed this precise issue, noting that the scientific literature does not support the idea that drug use causes bipolar disorder but that it does clearly support the reverse proposition that "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms." 454 F.3d at 629. The ALJ did not fully explore this possibility.

In his review of the record, the ALJ also selectively cited to the psychiatrists who treated Ms. Randecker. There were many. Although many of them considered whether and to what

extent her substance abuse may have been a cause in the psychotic episodes, they did not come to any uniform conclusion. Most of them appear to have believed that the bipolar disorder was the primary source of the problems. For example, Dr. Norton in 2003 considered the question of drug use but ultimately concluded that "this is a primary mental illness." The ALJ did not discuss these other views. However, the ALJ did rely on a statement from Dr. Anleu. Specifically, the ALJ noted in his opinion that Dr. Anleu in March 2005 "stated [that] there did not appear to be any episodes of mania or hypermania when the claimant was not using drugs." R. 35. The ALJ suggested that Dr. Anleu believed drugs were the cause of the episodes. Yet, Dr. Anleu's report is more equivocal. She stated:

> Client is a 39 year old female with a long history of drug dependence. Apparently she has presented two episodes of psychotic symptoms. **It is unclear if it's only related to the drug use or if it is a primary AXIS I diagnosis.** *There doesn't appear to be any episodes of mania or hypomania*[4] *when not using drugs.* Currently she has been maintaining sobriety.

R. 405. The ALJ quoted the part in italics, but erroneously ignored the part in bold. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence that is contrary to his conclusion).

In sum, the ALJ failed to adequately address this admittedly difficult question about what role substance abuse may have played in these psychotic episodes. This failure justifies a remand. *See, e.g., Harlin v. Astrue*, 424 Fed. Appx. 564, 568-69 (7th Cir. 2011) (remanding because the ALJ ignored the plaintiff's treating psychiatrist and because the ALJ did not "adequately disentangle[] the effects of [plaintiff's] drug abuse from those of her other impairments").

---

[4] The phrase "hyper mania" was printed in the report but then was crossed out with the word "hypomania" handwritten above it. R. 405.

Turning to the medication issue, the ALJ likewise downplayed several relevant points. He placed much weight on the fact that Ms. Randecker made "steady progress" after her medications were "restarted" or "adjusted" during her hospital stays. R. 39. This observation suggests that it was a simple and quick matter of tweaking her medicine and then she was back to normal. But the record reveals a more protracted and complex process. For one thing, many of the hospital stays were lengthy: November 2004 (12 days); January 2006 (11 days); March 2006 (6 days); February 2007 (17 days). Ms. Randecker had severe symptoms, such as smearing feces on the wall. It took time for her doctors to experiment with different drugs, different combinations, and different dosages. She did not always receive the same medications from visit to visit. And all of this was done in the structured setting of a hospital. *See Harlin*, 424 Fed. Appx. at 568 ("the evidence that the ALJ chose to rely on – discharge summaries showing [plaintiff's] improved condition at the time of discharge – was hardly remarkable because one would expect a patient with severe mental impairments to improve upon a course of treatment in a structured hospital environment"). If Ms. Randecker were to go back to work, she would have to manage her medication without the benefit of taking a week off to readjust her medication.

Although the ALJ faulted Ms. Randecker for not taking her medication, he failed to consider that her illness may have been the cause. *Kangail* again provides guidance. The Seventh Circuit rejected the ALJ's assessment that the plaintiff "could work when she took her medicine":

> [I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease), may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.

454 F.3d at 630 (citations omitted). This point applies here as well and justifies a remand. *See also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.")

Yet another possible explanation for her not taking medications is that they caused side effects making it hard for her to work. Although she was first hospitalized with an acute episode in 2003, she continued to work off and on up until October 2005. In March of that year, she told her doctor that she had recently gotten a job, but was worried that she could not work the night shift because she felt tired from the Depakote. R. 403. In July, she was receiving 20 mg of Geodon twice a day but did not take it on work days because it was sedating. R. 401. In October, she was fired from absenteeism due to manic symptoms. R.65. She had stopped taking the medication because she was "worried about side effects." R. 39. This experience supports the assertion that the side effects prevented her from working. The record contains other evidence about the side effects. For example, in 2010, her therapist noted that that one of the drugs she was then taking, Risperdal, caused "anxiety, insomnia, weight gain, headaches, fatigue, seizures." R. 779. At the administrative hearing, she testified that her medication made her "very sleepy" and that she naps two to three times a day. R. 60, 68. In his opinion, the ALJ did not address this evidence about side effects, stating only that "no treating physician has indicated that the claimant should expect to experience any side effects that would result in any work-related limitations." R. 41. The ALJ should consider this issue in more depth on remand

For all the above reasons, this Court finds that a remand is warranted. This Court therefore need not address Ms. Randecker's other arguments, including her assertion that a remand is warranted for the independent reason that the Appeals Council failed to consider

material new evidence relating to her hospitalization in November 2011, a month after the ALJ issued his opinion. This evidence can now be considered on remand.

### III. CONCLUSION

For the reasons given, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: December 9, 2014      By: _____
                                                          Iain D. Johnston
                                                          United States Magistrate Judge